VERMONT SUPERIOR COURT
Environmental Division
32 Cherry St, 2nd Floor, Suite 303,
Burlington, VT 05401
802-951-1740
www.vermontjudiciary.org



ENVIRONMENTAL DIVISION
Docket No. 21-ENV-00066

| In re Shore Acres Conditional Use | DECISION ON THE MERITS |
| --- | --- |

John P. and Ruth M. Miller (the Millers) appeal the June 22, 2021 decision of the Town of North Hero Development Review Board (DRB) approving an amendment to the planned unit development (PUD) permit 4601A and a conditional use (CU) application for new and expanded uses at the Shore Acres Inn and Restaurant. Shore Acres is owned by Neil Gillespie and Kelly Ross through Celtics6 RE Holdings, LLC and is located at 237 Shore Acres Drive, North Hero, Vermont. The amended PUD and CU application include an Event Venue with a tent site and parking area, and a new outdoor Bar/Restaurant with parking and expanded lake access.

The Millers are self-represented. Celtics6 RE Holdings, LLC (Shore Acres) is represented by attorney Alexander J. Larosa, Esq. The Town of North Hero is represented by Michael John Tarrant, II, Esq. Additional self-represented neighbors, Ellen L. Isham, and Peter Mickley, participated in this matter.

The Millers raise three questions for the Court's review in their September 23, 2021 Revised Statement of Questions. These questions are:

1. How will the increased traffic from Shore Acres Inn and Restaurant impact neighboring properties and the Town of North Hero?

2. How will the noise generated by the functions at the proposed tent site impact the neighbors?

3. How will placement of the proposed tent impact both the visual and physical location of adjoining neighbors?

The Court conducted a one-day remote trial on December 16, 2021, using the WebEx platform. The Court completed a site visit on its own on February 24, 2022. Following trial and prior to the site visit, parties were allowed to file requests for the Court to observe certain aspects of the Project site and surrounding area. The Court made the observations as requested.

**Findings of Fact**

1.   Celtics6 RE Holdings, LLC, owns a 44-acre parcel located at 237 Shore Acres Drive (the Property) in North Hero, Vermont which includes the existing Shore Acres Inn & Restaurant.

2.   The Property is located off of US Route 2 and currently contains a driveway leading to a main building that includes a restaurant and inn; three additional outbuildings that contain additional hotel rooms, a laundry, and a bar; outside tennis courts; parking areas; and a dock in Lake Champlain.

3.   The Property is largely open space that is mostly maintained grassy areas with a few bedrock outcrops and wetlands areas.

4.   The Property has approximately 1,600 feet of frontage on US Route 2.

5.   The Property slopes easterly from US Route 2 to Lake Champlain.

6.   US Route 2 is a minor arterial roadway with generally light traffic volumes.

7.   In the area of the Property, US Route 2 is flat with a little uphill topography relief to the north.

8.   Sight lines at the Property are approximately 550 feet to the north where there is a crest and curve, and in excess of 1,000 feet to the south, where the road is straight and flat.

9.   The VTrans safe stopping distance for US Route 2 in the Property area is 400 to 475 feet for the design speed of US Route 2.

10.   With an increase of 5 MPH over the US Route 2 design speed limit, the safe stopping distance is 550 feet.

11.   The area of the Project, and the Town of North Hero generally, are not "high crash areas."

12.   Current site activities include 23 rentable rooms, a seasonal restaurant open 5 PM to 9 PM, and occasional tennis play.

2

13. In 1992, Town permitting approved of special events at the Property with few limits other than complying with performance standards and a maximum of 125 guests.

14. The DRB imposed a condition in approving the Project limiting events at the new Event Venue to a maximum capacity of 250 guests.

15. The types of past and anticipated future events include, but are not limited to, weddings, car shows, town events, dog sledding, and charitable gatherings. These events may have live music, disc jockeys, and alcohol.

16. In 2021, with the impact of the Covid-19 pandemic, there were two (2) indoor events with a 70-person maximum occupancy and two (2) outdoor events with a 150-person maximum occupancy.

17. The outdoor events were located adjacent to the south side of the inn and fairly close to both Lake Champlain and the southern property line. The events took place in May and June from approximately 4 PM to 9:30 PM.

18. There were no noted traffic issues associated with these events.

19. The proposed new physical development on the Property includes:
    a. A new parking area and stormwater management for the Event Venue;
    b. An Event Venue consisting of a large rectangular grassy area appropriate for siting tents;
    c. The existing tennis court parking area will be expanded and will include new associated stormwater management infrastructure;
    d. A new restaurant and bar with associated parking, stormwater management, wastewater system enhancement, and new dockage on Lake Champlain.

New parking area and stormwater management for the Event Venue

20. The Event Venue parking area is located to the south of Shore Acres Drive just east of the 100-foot front yard setback from US Route 2.

21. The 100-foot front yard setback applies to structures. The proposed parking area was located outside of the setback even though it may not apply.

22. This area has 173 parking spaces which measure nine (9) feet by ten (10) feet with a twenty-four (24) foot aisle between the rows of spaces.

23. The access drive from US Route 2 is Shore Acres Drive and will be arranged as mostly one-way traffic to minimize any back-ups on US Route 2.

24. The parking area will be regraded.

25. The surface of the parking area will be both grass and crushed stone.

26. The parking area is designed to blend into the existing natural environment.

27. There is no lighting proposed in the parking area.

28. The stormwater treatment aspects of the parking area include a gravel wetland.

29. The landscaping on the south and west perimeter is composed of rhododendron hedging planted linearly to provide an aesthetic balance between height and screening.

30. The landscaping on the north side will have evergreen plantings.

31. There is a walkway from the parking area to the Event Venue. This includes lighting at the ground level designed as solar based bollard lights.

32. A similar new walkway will connect the Event Venue with the expanded tennis court parking area.


Event Venue

33. The new Event Venue is located south of Shore Acres Drive and southeast of the new parking area.

34. The Event Venue is rectangular in shape and will feature a closely mowed grass surface.

35. The Event Area will be regraded with some fill on the lake side (east northeast) with approximately two feet of fill at the maximum.

36. The maximum tent height will comply with the thirty-five (35) foot height limit for the zoning district.

37. The Applicant proposed and the DRB accepted a maximum occupancy of 250 guests at the Event Venue. The Applicant has also suggested that for events organized by the Town or for charity, the number of participants may exceed 250. We do not see any language

in the permit granted by the DRB, however, that would allow for such an exception to the 250-guest maximum.

38. The Event Venue will accommodate two different tent locations, with only one tent erected at a time. This will allow grass to regrow in the area outside of an erected tent.

39. Tents will be erected for specific events. The practice will be for a tent to go up the day before the event, remain up the day of the event, and then be taken down the day following the event.

40. A maximum of 15 events will be held annually. Some events may not require a tent.

41. The Town's 1992 prior approval had no annual limit on the number of events.

42. The tent site and tents will be visible from the neighboring properties.


Visual Impact

43. The proposed Event Venue location formalizes where events will take place. Currently, the 1992 Town approval of special events does not regulate the location or timing of events on the Property, apart from imposing general performance standards.

44. Designating a specific Event Venue protects wetlands and provides greater handicapped accessibility.

45. The design of the Event Venue attempts to minimize improvements to keep the site looking as close as possible to current conditions.

46. Headlights of vehicles circulating and exiting the property will continue to have some impacts.

   a. As a vehicle exits the site, the headlights shine into a field across US Route 2. As the vehicles turn south there is a row of hedges that limit impacts to the Miller residence, although there will be some light impact to Miller residence.

   b. Vehicle lights in the parking area are mitigated by a four (4) foot high natural berm.

47. Views of the lake and mountains across the lake from the Miller residence will be preserved, although tents when erected will be in the foreground of the view. Without an erected tent, this view will remain unchanged.

5

<u>Expanded existing tennis court parking area and associated stormwater management</u>

48. The tennis court parking area located to the west of the tennis courts will have expanded parking and new associated stormwater management.

49. Limited lighting is proposed in this area.


<u>New restaurant and bar with associated parking, stormwater management, wastewater system enhancement, and new dockage on Lake Champlain</u>

50. The entrance drive for the new restaurant and bar is a continuation of Shore Acres Drive to the northeast.

51. The name of this restaurant is the Bravo Zulu Bar and Restaurant.  It will be designed with a Navy motif.

52. There is limited downcast lighting in the new restaurant parking area.

53. The area of the new restaurant is close to neighboring residential properties to the north.

54. The DRB imposed maximum decibel levels (dBA) for noise stemming from this restaurant as a condition of approval.   Those maximum levels are 55 dBA during the day and 45 dBA at night at nearby residences and areas of frequent human use.  <u>In re Celtics 6 RE Holdings, LLC</u>, Decision at 5 (Tn. of North Hero Dev. Review Bd. Jul. 12, 2021).  These limits imposed by the DRB applied only to the new restaurant and not the Event Venue.

55. The new restaurant will only be open seasonally and will close by 10:00 PM each day.


<u>Traffic</u>

56. The Applicant presented additional traffic estimates only for the new restaurant, because the Property was already approved for hosting events.  Using the Institute of Transportation Engineers (ITE) Trip Generation Manual, the proposal will generate:

    a. two (2) additional trips during the AM Peak

    b. twenty-seven (27) additional trips during the PM Peak.

57. VTrans has no concerns with safety for the proposed activities.

58. VTrans considers US Route 2 in this area a lightly traveled minor roadway. For two stretches of Route 2 in North Hero, 2019 VTrans data identified an annual average daily traffic volume of 2500-2600 vehicles.

59. Applicant's engineer presented as a general rule that in "resort towns," traffic volume is typically 14-20% higher in summer months than the annual average. Neighbors to the project stated that traffic volumes are much higher in the area during the summer months.

60. The Covid-19 pandemic may have reduced traffic in the area according to the parties, although the annual traffic data presented pre-dates the Covid-19 pandemic.

61. Even if the actual traffic on US Route 2 is much greater than the evidence presented, the impacts to traffic from the proposal will likely not be significant. There may be a slightly longer wait for vehicles to exit the Property in that case.

62. Shore Acres Drive will be widened to accommodate traffic entering and exiting the Property and will be configured generally as one-way to keep traffic moving on US Route 2.

63. Some events will include the use of buses to transport guests to and from the Property, which may reduce traffic impacts.

64. The General Manager of Shore Acres stated that in his experience, every event or night at a restaurant will feature guests departing at staggered times. It is possible for this to be true even while a large proportion of guests depart at the same time, which would create a moment of peak traffic at the intersection of Shore Acres Drive with US Route 2.

65. As the Property has been operated both as an event venue and as a restaurant, there have been vehicles leaving the Property at night for many years. Thus, there is no mitigation proposed for any light disturbance caused by night-time vehicle movements.

66. Plantings could be placed on the Millers' property to screen vehicle light impact to the Millers residence, however, none is proposed.

Noise

67. Events will be concluded by 10 PM.

68. All site usage is subject to the Town performance standards.

69. Within the Event Venue, any stage and speakers will be set up to direct noise to the north.

70. Sound mitigating panels will be located on the south side of the stage and music.

71. The overall tent structure will be set up to enclose and direct noise toward the lake and to the north.

72. An Event Manager will be on-site during events to help mitigate any noise issues.

73. During recent events, Neil Gillespie was on-site during the event to observe any noise impacts.

    a. Mr. Gillespie traveled the property line at peak noise times;

    b. Mr. Gillespie observed that noise levels became quieter as the distance from the source increased;

    c. Noise was just noticeable at US Route 2;

    d. It was easy to have a conversation along the southern property boundary;

    e. Using his phone app, Mr. Gillespie measured noise levels at approximately 73 dBA within the tent and at 53 dBA approximately 100-150 yards (300-450 feet) from the tent. At 150 yards he could not distinguish any details of the noise.

74. The southern edge of the Event Venue will be set back 280 feet from the southern property line. Shore Acres will primarily use the northeast portion of the Event Venue area furthest from the southern property line where possible without damaging the grass.

75. There will be a maximum of 15 special events held at Shore Acres annually.

76. Events will end by 10:00 PM. Last call for beverages will be 9:30 PM. Music will end by 9:15 PM. The Event Manager will encourage guests to leave if they linger beyond 10:15 PM.

77. The Applicant offered at trial to accept a noise limit for the Event Venue of a maximum noise level (dBA Lmax) at adjacent residences and other areas of frequent human use of 55 dBA during the day and 45 dBA at night.

78. On June 22, 2021, the DRB approved the PUD and CU applications for the Event Venue and Bravo Zulu Bar and Restaurant. The approval contained conditions, including those

already mentioned.  The Millers timely appealed the DRB's approval to this Court on July 12, 2021.

## Conclusions of Law

1. How will the increased traffic from Shore Acres Inn and Restaurant impact neighboring properties and the Town of North Hero?

Article 6, Section 6.1(E) **Review Standards**: (1) requires that the DRB shall find that the proposed development will not result in an undue adverse effect on any of the following:

(c) **Traffic on roads and highways in the vicinity.**  The DRB shall consider the projected impact of traffic resulting from the proposed development on the capacity, safety, efficiency and use of affected roads, bridges, and intersections.[1]

US Route 2 is a minor arterial roadway with generally light traffic volumes.  In the area of the Property, US Route 2 is flat with a little uphill topography relief to the north.  Sight lines at the Property are approximately 550 feet to the north where there is a crest and curve and in excess of 1,000 feet to the south, where the road is straight and flat.  The VTrans safe stopping distance for US Route 2 in the Property area is 400 to 475 feet for the design speed of US Route 2.  With an increase of 5 MPH over the design speed limit, the required stopping distance is 550 feet.  Thus, the Project satisfies the minimum safe stopping distances.  The area of the Project and the Town of North Hero generally, are not "high crash areas."

Neither the Applicant nor the Millers or any other interested party presented the Court with a traffic study.  The Applicant's engineer presented some data on existing traffic in the area from the VTrans database.  He presented data on additional trips to and from the Property generated by the Project, but only for the new restaurant, because the Property was already approved for an unlimited number of events.  Using the ITE Trip Generation Manual, the proposal will generate:

    a. two (2) additional trips during the AM Peak

    b. twenty-seven (27) additional trips during the PM Peak.

---

[1] Within their Statement of Questions at question 1, Appellants mistakenly cite to "Section 6.1,c)."  We correct that mistake here.

9

Vtrans has no concerns with safety for the proposed activities. As the Event Venue use and existing restaurant have prior approval, vehicles have historically left the Property at night. There is therefore no mitigation proposed for any light disturbance caused by night-time vehicle movements. Plantings could be placed on the Millers' property to screen vehicle light impact to the Millers residence, yet none is proposed.

US Route 2 experiences more traffic during the summer season than it does during the winter season. The Covid-19 pandemic may have reduced traffic in the area, but the Vtrans traffic data presented by the Applicant's engineer were taken from 2019 and so were not affected by this trend. Even if the actual traffic on US Route 2 is much greater than the evidence presented, the impacts to traffic from the proposal will not be significant; there may simply be a slightly longer wait for vehicles to exit the Property. Shore Acres Drive will be widened to accommodate traffic entering and exiting the Property and will be configured generally as one-way to keep traffic moving on US Route 2.

Some events may include the use of buses to transport guests to and from the Property and this will reduce traffic impacts. Shore Acres' General Manager's experience has been that vehicle traffic leaving the existing restaurant or Event Venue will trickle out and there will not be a mass exit. This pattern is expected to continue.

The Town Regulations require us to consider whether the Project would have an "undue adverse effect" on the "capacity, safety, efficiency and use of affected roads, bridges, and intersections." Because the language of "undue adverse effect" mirrors that used in the famed Quechee test developed for Act 250 review, we apply that test to determine whether there is an adverse undue effect here. *See* Re: Quechee Lakes Corp., Nos. 3W0411-EB and 3W0439-EB, Findings of Fact, Conclusions of Law and Order (Vt. Envtl. Bd. Nov. 4, 1985); In re Grp. Five Invs. CU Permit, 2014 VT 14, ¶ 14, 195 Vt. 625 (upholding our Court's application of the two-pronged Quechee test to the municipal zoning context, even where the town regulations referred only to an "adverse effect"), *overruled on other grounds by* In re Confluence Behav. Health, LLC, 2017 VT 122 ¶ 17, 206 Vt. 302.

In the Quechee approach, we first consider whether the project would cause an adverse effect on the characteristic in question. If it would not, our analysis ends. If it would, we ask

whether the effect would be unduly adverse, which it would be if any of three criteria are met: either the project must "violate a clear, written community standard intended to preserve the aesthetics or scenic, natural beauty of the area" or "offend the sensibilities of the average person," or the applicant must have "failed to take generally available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its surroundings." In re Times & Seasons, LLC and Benoit, 2008 VT 7, ¶ 8, 183 VT. 336 (internal citations omitted).

We conclude that the Project will not have an undue adverse effect via traffic on the capacity, safety, efficiency and use of roads, bridges, and intersections on Route 2. The evidence presented all suggests that there is significant excess capacity on Route 2, and additional trips added by the Project will not exceed that capacity or significantly reduce traffic efficiency. Moreover, the evidence suggests that any safety concerns with traffic exiting the property are minimal and, in any event, exist already due to present uses of the property. Since there is no adverse effect, we need go no further in our analysis to conclude that the Project will not cause undue adverse effects via traffic impacts.

2. How will the noise generated by the functions at the proposed tent site impact the neighbors?

Article 6, Section 6.1(E) **Conditional Use Review Standards**: (2) allows the DRB to impose appropriate conditions and safeguards with respect to:

(b): **Adequacy of circulation, parking, and loading facilities.** The DRB shall consider the adequacy of circulation, parking, and loading facilities, including compliance with Section 7.5. Particular consideration shall be given to the effect of noise, glare or odors on adjoining properties and state and town highways.[2]

Article 6, Section 6.4(E), **Planned Unit Developments** directs that:

---

[2] Within their Statement of Questions at Question 2, Appellants mistakenly cite to "Section 6.1,2)b)." We have corrected the citation here. Furthermore, Appellants do not cite to other relevant provisions of the Bylaws concerning noise impacts. In light of the leniency with which we may read a *pro se* litigant's Statement of Questions to ensure no prejudice occurs due to their self-representation, see 83 N. Willard St., No. 121-10-19 Vtec, slip op. at 5 n.2 (Vt. Super. Ct. Envtl. Div. Sept. 14, 2021) (Walsh, J.), and our jurisdiction over matters intrinsic to those raised in a Statement of Questions, In re Jolley Assocs., 2006 VT 132, ¶ 9, 181 Vt. 190, we consider the other applicable provisions of the Bylaws, which the broad language of the Question, in any event, implicates.

Mixed uses shall be arranged to be compatible, and to minimize visual and noise impact for the residents of the development and adjacent properties.

Article 7, Section 7.6(A), **Performance Standards** directs that:

Uses shall not under normal circumstances: Emit any sustained noise, odors, dust, smoke or noxious gases that endanger the health, safety or welfare of any person or that have a tendency to cause injury or damage to property, business or vegetation.


Historically, events on the property have included weddings, car shows, town events, dog sledding, and charitable gatherings.  These events have had live music, disc jockeys, and alcohol.  Nothing in the DRB approval changed the types of events that may be hosted at the proposed Event Venue or limited organizers' ability to play live or recorded music or serve alcohol.  In 2021, with the impact of the Covid-19 pandemic, there were two (2) indoor events with a 70-person maximum occupancy and two (2) outdoor events with a 150-person maximum occupancy.  The outdoor events were located adjacent to the south side of the inn and fairly close to the southern property line.  The events took place in May and June from approximately 4 PM to 9:30 PM.  During recent events, Neil Gillespie was on-site during the event to observe any noise impacts.

   a.  Mr. Gillespie traveled the property line at peak noise times;
   b.  Mr. Gillespie observed that noise levels became quieter as the distance from the source increased;
   c.  Noise was just noticeable at US Route 2;
   d.  It was easy to have a conversation along the southern property boundary;
   e.  Using his phone app, Mr. Gillespie measured noise levels within the tent at approximately 73 dBA, and at 53 dBA approximately 100-150 yards (300-450 feet0 from the tent.  At 150 yards, he could not distinguish any details of the noise.

 For proposed events we note that all site usage is subject to the Town performance standards and other standards quoted above.  Within the Event Venue, any stage and speakers will be arranged to direct noise to the north.  Sound mitigating panels will be located on the south side of the stage and music.  The overall tent structure setup will enclose and direct noise toward

the lake and to the north.  An Event Manager will be on-site during events to help mitigate any noise issues.

The maximum of 15 annual Events will end by 10:00 PM.  Last call for beverages will be 9:30 PM.  Music will end by 9:15 PM.  The Event Manager will encourage guests to leave if they linger beyond 10:15 PM.  During trial, in an effort to mitigate any potential noise impacts to neighbors, the Applicants offered to accept a condition limiting noise for the Event Venue using the same limits imposed to the north on the new restaurant.  We therefore impose the stipulated condition that noise, including music, from the Event Venue, shall not exceed 55 decibels (dBA) during the day and 45 dBA during the night at adjacent residences and areas of frequent human use.  While the DRB condition limiting noise does not address the duration of the noise limit, we impose an instantaneous noise limit, also known as "Lmax."

An instantaneous noise limit is more appropriate in this case than a limit on noise averaged over a period such as ten minutes or an hour.  Noises will be generated for relatively short and sporadic intervals at the Event Venue, and neighbors expressed concerns about how they will experience the noise from events as they are occurring.  *See* In re N. E. Materials Grp., LLC/Rock of Ages Corp. Act 250 Permit, 2019 VT 55, ¶ 12, 210 Vt. 525 (2019) ("Instantaneous noise levels more accurately demonstrate what people are actually hearing as opposed to an average sound reading over any period of time.").  There is less cause for concern about long-term consequences of the noise for human well-being in the area, given, again, how short and sporadic the noise will be.  Id. ("[C]umulative noise impacts over longer periods of time . . .  are usually measured using  [an averaging method].").  Lmax is therefore the most appropriate metric, as well as the easiest for all parties to monitor to ensure compliance.

Based on our findings and the imposed stipulated condition, we conclude that the Project complies with Article 6, Section 6.1(E)(2)(B) Conditional Use Review Standards for adequacy of circulation, parking, and loading facilities with respect to noise; Article 6, Section 6.4(E), regarding noise from mixed uses at Planned Unit Developments, and Article 7, Section 7.6(A) regarding noise impacts on human health and well-being.  We therefore also conclude that the Event Venue will not cause an adverse effect via noise on neighbors to the Property.

3. How will placement of the proposed tent impact both the visual and physical location of adjoining neighbors?

Article 6, Section 6.1(F) **Conditions**. The DRB shall have the power to impose reasonable conditions and safeguards to ensure compliance with the standards above, including but not limited to, the following conditions:

(10): the DRB may limit the location of buildings, structures and landscaping to protect visual and physical lake access for neighbors.[3]

There is no allegation of or evidence relating to issues of impacts to physical lake access. The Millers' stated concerns relate exclusively to visual impacts.

The Event Venue parking area is located to the south of Shore Acres Drive just east of the 100-foot front yard setback from US Route 2. The area of the parking will be regraded. The surface of the parking area will be both grass and crushed stone. The parking area is designed to blend into the existing natural environment, which consists of grassy fields and wetlands. The landscaping on the southern and western perimeter of this parking area is comprised of rhododendron hedging planted linearly to create aesthetic balance between height and screening. The landscaping on the north side will have evergreen plantings.

The new Event Venue is located south of Shore Acres Drive and southeast of the new parking area. The Event Venue is rectangular in shape and will feature a closely mowed grassy surface. The Event Venue area will be regraded with some fill on the lake side (east northeast) with approximately two feet of fill at the maximum. This small amount of fill will create at most a minimal impact on views of the area from US Route 2 when no tent is erected. When a tent is erected, the maximum tent height will comply with the thirty-five (35) foot height limit for the zoning district. The Event Venue area will accommodate two different tent locations, with only one tent erected at a time. This will allow grass to regrow in the area outside of an erected tent. Tents will be erected for specific events. The practice will be for a tent to go up the day before the event, remain up the day of the event, and then be taken down the day following the event. A maximum of 15 events will be held annually. Some events may not require a tent. The tent site and tents will be visible from the neighboring properties.

---

[3] Within their Statement of Questions at Question 3, Appellants mistakenly cite to "Section 6.12)F)10))."

14

The proposed Event Venue formalizes where events may take place on the Property. Currently, the 1992 Town approval does not regulate the location, number, or timing of events. The design of the Event Venue attempts to minimize improvements to keep the site looking as close as possible to current conditions. Views of the lake and mountains across the lake from the Miller residence will be preserved, although tents when erected will be in the foreground of the view. Without an erected tent, this view is unchanged.

Sitting in de novo review, we must consider whether the proposal adequately protects neighbors' visual access to Lake Champlain or whether further conditions are necessary to ensure that it does. We again utilize the standard of the Quechee test, for although the Regulations do not here use the language of an "undue adverse effect," they state that the overall purpose of such conditions is "to ensure compliance with the standards above"—standards which do utilize the "undue adverse effect" language. Further, the question that this standard raises is in essence whether there is an adverse effect on neighbors' lake views. Our Supreme Court has stated that "the adverse effect test [referenced in municipal zoning ordinances] must be applied reasonably to prohibit only substantial and material adverse effects." In re Miller, 170 Vt. 64, 69 (1999) (emphasis added) (citing In re Walker, 156 Vt. 639, 639 (1991)). The Court also endorsed the use of the Quechee approach as a means of determining whether there are "substantial and material" adverse effects. In re Grp. Five Invs. CU Permit, 2014 VT 14, ¶ 14.

In the first step of the analysis, we ask whether the Project has an adverse impact on the Millers' visual access to the lake; or in other words, on their lake viewshed. We conclude that it does. When a tent is erected, there will be a new man-made feature in this viewshed, which may be relatively noticeable depending on the size of the tent in question. This feature may appear for up to 15 events in a year, which could equate to one event each week for a majority of the weeks in the summer season and early fall months. The evidence presented does not suggest, however, that a tent could ever fully obstruct the Millers' view of the lake, given their distance and location up-slope from such a tent.

Because there is an adverse effect, we proceed to consider whether that effect is unduly adverse. We conclude it is not. First, the project does not "violate a clear, written community standard intended to preserve the aesthetics or scenic, natural beauty of the area." The parties

have not presented the Court with a written community standard on point, nor have we discovered one through our research of the record, other than the language in the provision already quoted. While that language directs the DRB to protect the visual lake access of neighbors to a project, it does not clearly state that there may be no encroachments into existing lake viewsheds. Indeed, it could not plausibly do so without effectively ruling out all development in areas near the shoreline. The Town of North Hero has *not* elected to outlaw all development near the shoreline but instead has zoned areas within 500 feet of the shore as the "Shoreland District," in which it permits "[l]ow-density residential development and carefully sited commercial uses." Regulations 3.1(A)(4). In summation, there is no written standard that forbids all encroachments into viewsheds of the lake or outlaws event tents.

Second, this encroachment would not offend the sensibilities of an average person. Shore Acres will erect a tent only for 15 events in the summer and early fall months. Any tent will not even approach entirely blocking the Millers' view of the lake but rather will appear in the foreground of that view. The General Manager's past experience suggests that some walls of the tent will frequently be open, allowing some limited further sightlines to the lake through the space inside.

Finally, the Applicant has taken "generally available mitigating steps that a reasonable person would take to improve the harmony of the proposed project with its surroundings." These steps include selecting a tent pad site where minimal grading is required, thoughtfully landscaping the parking areas, which may also mitigate views of the tent, and committing to ensure that the tent is promptly taken down following any event requiring one.

Accordingly, although the Project will have some impact on easterly lake views of the neighbors, especially the Millers, we conclude these impacts will not be unduly adverse and so that further conditions are not warranted. The Project complies with Article 6, Section 6.1(F).

## Conclusion

For the foregoing reasons, the Court concludes that Shore Acres' application for an amendment to their PUD permit and for a new CU permit, as modified by the stipulation agreed to at trial concerning noise from the Event Venue, should be granted. Specifically, we conclude that traffic resulting from the Project will not cause an undue adverse effect to local roadways;

16

that functions at the Event Venue will not cause undue adverse noise impacts; and that the placement of tents on the proposed tent site will not unduly adversely impact lake views.  We remand to the Town of North Hero for the ministerial act of re-issuing a permit incorporating this further condition:

> "Music and other sounds from the special events venue shall not exceed 55 decibels (dBA Lmax) during the day and 45 dBA Lmax during the night at adjacent residences and areas of frequent human use."

A Judgment Order is issued concurrently with this decision.  This concludes the matter before the Court.

Electronically Signed:  3/22/2022 10:48 AM pursuant to V.R.E.F. 9(d).

Thomas G. Walsh, Judge
Superior Court, Environmental Division

17